# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE INSURANCE COMPANY OF THE
STATE OF PENNSYLVANIA,

              Plaintiff,

      v.

EQUITAS INSURANCE LIMITED,

              Defendant.

Case No. 17-cv-6850(LTS)(HBP)

## EXPERT REPORT OF DAVID W. J. SCOREY, Q.C.

I, DAVID W. J. SCOREY, Q.C. of Essex Court Chambers, 24, Lincoln's Inn Fields, London, WC2A 3EG, England, will say as follows:

### INSTRUCTIONS

1.    I have been instructed on behalf of the Plaintiffs, The Insurance Company of the State of Pennsylvania ('**ICSOP**') to provide my opinion on certain issues pertaining to its claim under two facultative reinsurance contracts between ICSOP and the predecessors of the Defendant, Equitas Insurance Limited ('**Equitas**').[1]

---

[1]    As a result of the difficulties encountered in the Lloyd's insurance market in the 1990s, Equitas was formed as part of the Lloyd's 'Reconstruction and Renewal' plan to assume the liabilities of Lloyd's underwriters which had written risks on the 1992 and prior years.

2.    Specifically, those acting for ICSOP have asked me to provide my opinion on certain issues of English law regarding:

    a.    the extent to which the reinsurer is liable to indemnify the reinsured following the latter's settlement of claims with the underlying policyholder; and

    b.    the availability of late notice as a defense to the reinsurer's indemnity obligations.

## BACKGROUND & MATERIALS

3.    In terms of the factual background, I understand that:

    a.    ICSOP provided coverage under an excess liability policy to Castle & Cooks Inc. with a limit of $20m for the policy period 1 October 1968 – 1 October 1971 (**'the Underlying Policy'**).

    b.    The Underlying Policy was expressly subject to Hawaiian law and jurisdiction: see Article V, Clause 12.

    c.    The Underlying Policy provided coverage on an occurrence basis, i.e., in respect of liability for personal injury and/or property damage arising out of an occurrence during the policy period: see Article 1.

    d.    The Underlying Policy was reinsured by ICSOP pursuant to two facultative reinsurance contracts.

      i. Under reinsurance contract no.8063343, ICSOP ceded part of the risk, namely 92.91% of 75% of the first $5m in losses per occurrence under the Underlying Policy ('**the First Layer Facultative Reinsurance**'). This equated to reinsurance of $3,484,125 of the first $5m coverage provided by the Underlying Policy.

      ii. Under reinsurance contract no.8063344 ICSOP ceded a further part of the risk, namely 25% of $15m excess of $5m in losses per occurrence under the Underlying Policy ('**the Second Layer Facultative Reinsurance**'). This equated to reinsurance of $3,750,000 in the event of a limits loss of $20m under the Underlying Policy.

e.    Both the First and Second Layer Facultative Reinsurances (collectively, the **Reinsurance Contracts**) were written on standard Form J1. The Schedules to both Reinsurance Contracts adopted the same period of reinsurance as the policy period under the Underlying Policy and the '*perils and interest reinsured*' was stated to be '*As Original.*' English Courts have consistently recognized, as one would expect with facultative reinsurance,[2] that these provisions evidence the parties' intention that coverage would be 'back to back,' i.e., coextensive, with the Underlying Policy.

f.    Both the First and Second Layer Facultative Reinsurances contained the same standard term endorsed on the front of Form J1 as follows:

---

[2] See, e.g., *Wasa International Insurance Co Ltd v Lexington Insurance Co* [2010] 1 AC 210 ('***Wasa***') at [55] *per* Lord Collins of Mapesbury. The authorities cited herein are provided in the accompanying Appendix of Foreign Law Authorities.

> *'In the event of any occurrence likely to result in a claim under this Policy, immediate notice should be given to:-'*

However, neither of the Reinsurance Contracts were completed so as to include a name and/or addressee for any such notice. The parties' failure to address the issue of notice is dealt with at paragraph 59(c) below.

4.  I understand that, following an indemnity provided by ICSOP pursuant to the Underlying Policy, it sought payment from Equitas under the Reinsurance Contracts. Following Equitas' refusal, ICSOP has commenced proceedings in the United States District Court for the Southern District of New York.

**PROFESSIONAL BACKGROUND**

5.  I am a practising barrister and tenant at Essex Court Chambers, 24, Lincoln's Inn Fields, London.

6.  I read law (B.A. Jurisprudence) at Oxford University, followed by an LL.M. at Leiden University in The Netherlands. I taught English law as a comparative law subject at Leiden University (1995 – 1996) and, on my return to London, was a part-time law lecturer at the London School of Economics, University of London (1996 – 1997).

7.  I was called to the Bar in October 1997. I was appointed Queen's Counsel in February 2015. I specialize in commercial litigation and arbitration with a specific focus upon insurance. I have extensive experience in respect of a wide range of insurance and reinsurance disputes, including primary, umbrella and excess polices, D&O and first-party property policies, quota share, facultative and non-facultative treaties and other forms of reinsurance and retrocession. In

4

respect of such disputes, in addition to advisory work, I have acted on behalf of litigants (including policyholders, insurers and reinsurers), in both court litigation and also domestic and international arbitrations.

8. As a result of my work in the field of Bermuda Form arbitrations, I co-authored a book on the subject published by Oxford University Press, *The Bermuda Form: Interpretation and Dispute Resolution of Excess Liability Insurance* (OUP, 2011). This book was the joint winner of the 2012 British Insurance Law Association Book Prize, awarded for the most notable contribution to literature in the field of insurance law.[3] A second edition was published in February 2018.

9. A copy of my curriculum vitae is attached at Annex I hereto.

## PROFESSIONAL OBLIGATIONS

10. In providing this Expert Report, I confirm that the opinions set out herein are my own and have not been influenced by those instructing me. Specifically, I have approached this task in the same manner as would be expected by the High Court in English litigation, *viz.,* my overriding duty is to the Court.

11. To that end, I have endeavoured to compile this report in accordance with the obligations and principles set out in the following documents:

    a. Part 35 of the Civil Procedure Rules of the High Court of England & Wales (**'CPR Part 35'**) which deals with Experts and Assessors;

---

[3]    The other joint winner was Jacobs, Masters & Stanley *Insurance Coverage Litigation and Liability Insurance in International Arbitration* (2nd edn, Hart, 2011).

b.    the Practice Direction which supplements CPR Part 35; and

c.    the Admiralty & Commercial Court Guide, 10th Edition (Section H2 & Appendix 8).

12.   Thus, according to those principles, the opinions set out herein are uninfluenced by the pressures of litigation and are intended to provide independent assistance to the Court by way of objective and unbiased opinion in relation to matters within my expertise.

## SUMMARY OF ISSUES AND OPINIONS

### *Liability of the Reinsurer*

13.   In the dispute between ICSOP and Equitas regarding ICSOP's claim to reimbursement under the Reinsurance Contracts, I understand that Equitas has questioned ICSOP's ability to 'allocate' its loss under the Underlying Policy to the Reinsurance Contracts where that underlying liability (as determined by Hawaiian law) extends to losses beyond the reinsurance period in the Reinsurance Contracts.

14.   Specifically, Equitas has stated as follows in the Joint Rule 26(f) Report as to the scope of discovery:

> *'Under English law, ICSOP is not permitted to allocate the entire amount of a continuous loss that allegedly spanned decades to the reinsurance contracts at issue here which cover only losses occurring during the limited three-year period of the reinsurance contracts.'*

6

15. Accordingly, those acting for ICSOP have asked me to provide my opinion as to the position under English law with regards to this statement. In providing my opinion, I have reviewed the materials listed in Annex II hereto, in addition to my own research, knowledge, experience and expertise concerning English law on this issue

16. My opinion can be summarised as follows:

   a. Under English law, in circumstances where the governing law of the underlying insurance policy is known or readily ascertainable, the reinsurer's liability to reimburse the reinsured under a facultative policy of reinsurance will mirror the liability of the reinsured under the governing law of the underlying policy.

   b. ICSOP's liability under the Underlying Policy is expressly governed by Hawaiian law. In those circumstances, Equitas is required to reimburse ICSOP *qua* reinsured for the sums settled pursuant to liability imposed by Hawaiian law, even if no such liability would have arisen *if* the Underlying Policy were governed by English law.

   c. Where, as here, the Reinsurance Contracts contain a 'follow-the-settlements' clause and the reinsurance is intended to be 'back-to-back', the reinsured need show only that the settlement was one which fell within the terms of the reinsurance policy as a matter of law '*or arguably did so*'.[4]

   d. Contrary to what appears to be Equitas's argument, the reinsurer's liability

---

[4] *Tokio Marine Europe Insurance Ltd v Novae Corporate Underwriting Ltd* [2013] EWHC 3362 (Comm) at [87].

would be determined by applying principles of English law (and thereby ignoring the extent of the liability imposed in this case by Hawaiian law) only in circumstances where the governing law of the underlying insurance was not known or could not have been readily ascertained at the time the reinsurance was written.

### Late Notice

17.  I understand that Equitas had denied liability on the basis that notice under the Reinsurance Contracts was late. In those circumstances, I am asked to provide my opinion as to:

    a.  English law on the issue of late notice of claims under reinsurance contracts and whether there is any general rule that late notice operates as a defence to a claim.

    b.  Whether the notice requirement in the Reinsurance Contracts is to be construed as a condition precedent as a matter of English law.

    c.  The reinsurer's remedy, if any, for late notice under English law.

    d.  Whether any different consequences flow from the fact that the failure to give timely notice is alleged to be as a result of intentional misconduct or 'gross negligence'.

18.  My opinions regarding this issue can be summarised as follows:

    a.  Unless prompt notice is an express condition precedent, English law does not recognise late notice as a defence to a claim for an indemnity. Where

8

notice is not an express condition precedent to payment, the only consequence of late notice is that it *may* give the reinsurer a counterclaim for damages *if* it can actually prove loss to have been caused by the untimely notice.

b.  The notice requirement in the Reinsurance Contracts would not be construed as a condition precedent as a matter of English law.

c.  If ICSOP provided untimely notice, the consequence is that Equitas has a technical claim for breach of contract. If Equitas can establish pecuniary loss, it would have a counterclaim for such loss.

d.  I understand that some US courts have held, as a matter of New York law, that the reinsured's late notice might defeat coverage, even in the absence of any measurable harm to the reinsurer, where the reinsurer can show that the reinsured acted in 'bad faith'[5] in failing to provide timely notice, including where the reinsured's failure to provided notice was 'grossly negligent.' As a matter of English law, it does not matter whether ICSOP's putative failure to give notice could be shown to be deliberate, negligent or grossly negligent.

---

5   As a matter of English law, any allegation of 'bad faith' connotes dishonesty and fraud. See, by way of example, *Price v Society of Lloyds* [2000] Lloyd's Rep IR 453; and see Lloyd's Act 1982 at §14(3).

9

## DETAILED DISCUSSION: LIABILITY OF THE REINSURER

19. As I understand Equitas's contention, it suggests that English law (which governs the Reinsurance Contracts) would not permit recovery in respect of losses in periods beyond the period covered by the Reinsurance Contracts, irrespective of the position under Hawaiian law, which determines ICSOP's liability pursuant to the Underlying Policy.

20. Equitas's focus upon English law governing the Reinsurance Contracts is wrong and, critically, ignores the fact that English law *qua* governing law of the Reinsurance Contracts recognises and reflects the nature, scope and extent of liability arising under the Underlying Policy as a matter of Hawaiian law.

21. The starting point is the 'follow the settlements clause' ('**FTS Clause**') found in the Reinsurance Contracts.

> *'Now we the underwriters hereby agree to reinsure against loss to the extent and in the manner hereinafter provided.*
>
> *Being a Reinsurance of and warranted same gross rate, terms and conditions as and to follow the settlements of the Company...'*

22. The basic approach of English law to FTS Clauses is that, where one is incorporated into a reinsurance policy, the reinsurer will *prima facie* have to pay what was agreed under the settlement of liabilities under the direct policy. As explained by Goff LJ in *The Insurance Company of Africa v Scor UK* [1985] 1 Lloyd's Rep 312 at 330:

> *'In my judgment, the effect of a clause binding reinsurers to follow settlements of the insurers, is that the reinsurers agree to indemnify*

> insurers in the event that they settle a claim by their assured, i.e. when
> they dispose, or bind themselves to dispose, of a claim, whether by
> reason of admission or compromise, provided that the claim so
> recognised by them falls within the risks covered by the policy of
> reinsurance as a matter of law, and provided also that in settling the
> claim the insurers have acted honestly and have taken all proper and
> businesslike steps in making the settlement.'

23.  There is a *'powerful and far-reaching'* presumption that reinsurance is intended
     by the parties to respond to claims which are payable under the direct policy.[6]
     That is because the insurable interest which first entitled the insurer to obtain
     reinsurance is the insurer's *exposure* under the original policy.[7]

24.  In such circumstances, the reinsurer and reinsured have entered into a bargain
     that, if the reinsured is liable under the insurance contract, the reinsurer will
     subsequently be liable to pay the proportion which it has agreed to reinsure.[8]
     There is a strong presumption in English law that, under proportional facultative
     reinsurance policies, such as those at issue here, the liability of the reinsurer is to
     reflect that of the reinsured. In such cases the insurance and reinsurance policies
     are seen as being coextensive or 'back-to-back.'[9]

25.  The matter was stated clearly by Lord Collins in *Wasa*,[10] namely that it will:

> '...almost invariably be the case that losses for which the insurer
> has indemnified the original insured would be within the
> reinsurance **even if the losses are payable under a foreign
> law or a foreign decision which takes a view different**

---

[6] *Wasa* at [16] *per* Lord Brown of Eaton-Under-Heywood.
[7] *Wasa* at [33] *per* Lord Mance.
[8] *Wasa* at [55] *per* Lord Collins of Mapesbury.
[9] *Wasa* at [116] *per* Lord Collins of Mapesbury; and *Groupama Navigation et Transport v Catatumbo Seguros* [2000] CLC 1534 ('**Catatumbo**') at [17] *per* Tuckley LJ.
[10] *Wasa* at [116] *per* Lord Collins of Mapesbury.

11

*from English law of what losses are recoverable.'*

(Emphasis supplied.)

26. Thus, the focus is upon the liability imposed by the law of the direct policy, i.e. Hawaiian law in this case. English law recognises the commercial sense of such an approach: the reinsurer has assumed the risk of the underlying policy; therefore, if losses occur which fall within the terms of the underlying policy, as interpreted under its governing law, the reinsurer will be held under English law to be liable for such sums.[11]

27. The English courts have consistently upheld this approach on the basis that it aligns with commercial common sense. It is understood that if this were not the case, the '*commercial intentions and expectations*' of the parties would be '*frustrated*' by allowing reinsurers to take '*uncommercial and technical points based on the difference between the effect given to terms in the insurance and the reinsurance under their respective governing laws*'.[12]

28. Put another way, particularly in facultative reinsurances, the reinsurer and reinsured embark upon a joint commercial venture and the same approach to 'liability' must be applied to the reinsurance as applies to the underlying policy. Thus, it is '*obvious*' that the terms of a reinsurance contract '*should be construed so as to be consistent with the contract of insurance*'.[13]

29. This can be seen in the seminal case of *Forsikringsaktieselskapet Vesta v Butcher* [1989] AC 852 ('***Vesta v Butcher***'). Norwegian law governed the

---

[11] *Wasa* at [58]-[60] *per* Lord Collins of Mapesbury.
[12] *Wasa* at [56] *per* Lord Collins of Mapesbury.
[13] *Wasa* at [60] *per* Lord Collins of Mapesbury.

underlying policy, which was reinsured on a 'back-to-back' basis using form J1, i.e., the same form used for the Reinsurance Contracts. The reinsurance, however, was governed by English law. Following a loss at a fish farm, the insurer indemnified the policyholder.

30. The underlying direct policy contained a warranty providing that the insured would maintain a 24-hour guard on the fish farm that was the subject of the insurance. The fish farm was damaged at a time during which it was unguarded. Thus, the warranty was breached, although this breach was irrelevant to the loss. *As a matter of Norwegian law*, which governed the direct policy, this breach of warranty excused the insurer's obligation only if the said breach caused the loss. This same warranty was incorporated into the reinsurance policy, which was governed by English law. *As a matter of English law,* the breach of a warranty would have operated to discharge the reinsured, and by extension the reinsurer, from liability – irrespective of whether or not the said breach was causative of the loss. The Court of Appeal held that English law had to look to the meaning and effect of the terms of the reinsurance via the prism of Norwegian law which determined the issue of the insurer's liability under the underlying policy.

31. As *Vesta* demonstrates, English law construes the Reinsurance Contracts as subject to the same liability (both as to its nature and extent) as the Underlying Policy. As made clear by the House of Lords in *Wasa*[14] at [60] *per* Lord Collins of Mapesbury:

> *'In the case of proportional facultative reinsurance the obvious commercial intention is for the original insurer to reinsure part of its own risk and for the reinsurer to accept that part of the risk, and it is*

---

[14] See also *Catatumbo* at [17] *per* Tuckley LJ: *'The scope and nature of the cover afforded [by the reinsurance] is the same as the cover afforded by the insurance. That at least I think is the effect of* Vesta *and it makes obvious commercial sense.'*

> *therefore equally obvious that the relevant terms in the reinsurance contract should be construed so as to be consistent with the contract of insurance. This is simply commercial common sense. Consequently, in proportional facultative reinsurance the starting point for the construction of the reinsurance policy is that the scope and nature of the cover in the reinsurance is co-extensive with the cover in the insurance. As Staughton LJ said in* <u>Youell v Bland Welch & Co Ltd</u> *[1992] 2 Lloyd's Rep 127, 132: "One can ... readily assume that a reinsurance contract was intended to cover the same risks on the same conditions as the original contract of insurance, in the absence of some indication to the contrary."'*

32.  Transposed to the facts of the current case, English law would construe the scope of coverage in the Reinsurance Contracts by reference to the scope of coverage as determined by Hawaiian law, which governs the Underlying Policy. Like *Vesta v Butcher*, it is irrelevant that no liability (or more limited liability) would arise under English law.[15]

33.  Under the FSL Clause, the question is simply whether the settled claim is arguably, as a matter of law, within the scope of the Underlying Policy. If that be the case, the reinsurer is obligated to provide coverage under the Reinsurance Contracts. The Courts have therefore describe the extent to which the reinsurer is bound by the reinsured's settlements as follows:[16]

> *'The reinsurer may well be bound to follow the insurer's settlement of a claim which arguably, as a matter of law, is within the scope of the original insurance, regardless of whether the Court might hold, if the issue was fully argued before it, that as a matter of law the claim would have failed.*

---

[15] *Wasa* at [114] *per* Lord Collins of Mapesbury, citing with approval Lord Templeman in *Vesta v Butcher* at 892.
[16] See *Hiscox v. Outhwaite (No 3)* [1991] 2 Lloyd's Rep 524 at 530.

14

> *[The] reinsurers are bound by reasonable compromises on liability and quantum between the insurers and their assured under the terms of the original policy.'*

34. Once it is established that the settled claim *prima facie* or arguably falls within the risks insured under the reinsurance policy, the reinsurer bears the burden or proving otherwise, including any allegation that the reinsured did not act in an honest and businesslike manner. In *Charman v Guardian Royal Exchange Assurance Plc* [1992] 2 Lloyd's Rep 607 ('***Charman***'), Webster J went so far as to suggest that when a reinsured has settled a claim, there is an automatic presumption in their favour that the reinsurer should indemnify the settlement, stating (at 613):

> *'In other words, in my view, there is a presumption that the reassured is entitled to call upon the reinsured to follow his settlement, so that if an issue arises, the burden must lie upon the reinsurer. I therefore agree, with respect, with the judgment of Justice of Appel Hunter in the Hong Kong Court of Appeal in <u>Insurance Co. of the State of Pennsylvania v Grand Union Insurance Co and Lowndes Lambert Construction Ltd</u> [1990] 1 Lloyd' Rep 208 at pp 223-224.'*

35. Webster J explained the rational for this position as follows (at 613):

> *'The essential element of the follow settlements clause is that the reinsurer puts his trust in the reassured; but a requirement that the reassured should have to prove that that trust is justified is quite inconsistent with the existence of any such trust at all. ...to impose upon the reassured the burden of proving that he had taken business-like steps in settling the claim might to some extent have the effect of requiring of him to prove that liability existed in fact. In my view, the relevant (i.e. evidentiary) effect of the construction of the clause in Scor is that, prima facie, the reassured is entitled to rely on the reinsurer to pay his claim upon him, upon proof that the reinsurer has paid his*

15

> *original insured and upon proof that his claim against his reinsurer falls within the reinsurance policy.'*

36.  The effect of the Court's judgment is to place an initial burden on the reinsured to establish: (1) that the reinsured has actually paid the settlement sums; and (2) that the claim arguably falls within the original insurance/reinsurance policy under which the payment was made.

37.  Once this is established, the burden of proof switches to the reinsurer: it is presumed that the reinsured's settlement falls under the cover provided by the reinsurance policy as a matter of law (namely an insured peril) and that the reinsured settled the matter honestly and in a businesslike manner; if the reinsurer wishes to challenge payment under the reinsurance policy, the burden in establishing that either of these tests has not been fulfilled rests on the reinsurer.

38.  Equitas's contention posits the notion that a reinsurance policy governed by English law is to be construed ignoring the law governing the direct policy and as if reference to all laws other than English law had been expressly excluded. As noted by the House of Lords in *Wasa,* such a contract would be *'wholly exceptional'* and their Lordships *'doubt[ed] if there is any market for such a reinsurance'*.[17]

39.  The approach of English law, exemplified by *Vesta v Butcher,* is premised upon 'back-to-back' coverage in circumstances where the law applicable to the direct policy is identified and therefore known to the reinsurers. In *Wasa,* the House of Lords recognised a narrow exception to the approach in *Vesta v Butcher,* namely

---

[17] *Wasa* at [62] *per* Lord Collins of Mapesbury, citing with approval Lord Griffiths in *Vesta v Butcher* at 895.

in cases in which the governing law of the underlying insurance contract is not stated, nor clearly ascertainable. In such circumstances, it could not be said that the reinsurers had agreed to reinsure the liability under the direct policy because the law establishing any such liability had yet to be determined. In *Wasa*, the direct policy had no express governing law and was subsequently held to be governed by Pennsylvanian law which mandated 'continuous trigger' coverage of the insurer. The House of Lords held that the reinsurance contract governed by English law was limited to coverage for loss during the policy period. As such, the policies were not 'back-to-back.'

40. However, the House of Lords in *Wasa* affirmed the approach in *Vesta v Butcher* where the governing law of the direct policy was expressly stated or was indeed ascertainable at the time of contracting. In such circumstances, the reinsurer was said to have had access to what has been described as the foreign '*legal dictionary*' with which to interpret the language of the insured's and reinsurer's liability.[18]

41. I am of the view that *Wasa* does not support Equitas's attempt to curtail or preclude ICSOP's claim: as with *Vesta v Butcher,* the governing law of the Underlying Policy was expressly stated as the law of the State of Hawaii (per Article V, Clause 12). In such circumstances, the parties are presumed to have intended that the contracts of insurance and reinsurance will have the same effect, i.e. be 'back-to-back'. Crucially, the reinsurers are taken to be aware that the laws of other countries can have a different effect on the liability of the reinsured than would be the case under English law, but '*that is a risk they must be taken to have assumed by writing international business. They will be*

---

[18] *Wasa* at [44] and [49] *per* Lord Mance.

*protected to the same extent as the insurer'.*[19]

42. Therefore, the position in respect of English law is that where the reinsurer is aware or could have made itself aware of the law governing the underlying insurance, the reinsurer is taken to accept all liability that may stem from the application of that law.[20]

43. Accordingly, English law would deem the reinsurers' liability to be the same as that of the reinsured, pursuant to the governing law of the original policy. Thus, under the FTS Clause, the reinsurer is bound by the reinsured's settlement as long as the loss was arguably covered under the original policy of insurance.

## DETAILED DISCUSSION: LATE NOTICE UNDER ENGLISH LAW

44. Under English law, there is no rule of contractual construction or law which provides a reinsurer with a defence to a claim if notice is provided late, even if breach of the contractual requirement to give notice was a 'serious' breach: see *MacGillivray on Insurance Law*, (14th edn, Sweet & Maxwell, 2015) (*'MacGillivray'*)[21] at §30-041.[22]

---

[19] *Wasa* at [73] *per* Lord Collins of Mapesbury, citing with approval the remarks of Tuckley LJ in *Catatumbo* at [20].

[20] *Wasa* at [95] and [107] *per* Lord Collins of Mapesbury. It is also elementary that the reinsured and reinsurer take the risk of changes in the law from the date of the inception of the policy. Put another way, the reinsurer cannot escape liability by claiming that the liability of the reinsured has been increased by way of judicial decisions extending the scope of the insured's liability under the policy: see *Wasa* [110] *per* Lord Collins of Mapesbury.

[21]      *MacGillivray* is one of the leading insurance texts. It is highly regard and frequently cited judicially.

[22]      See, to similar effect, *Pioneer Concrete (UK) Ltd v National Employers Assurance Ltd* [1985] 1 Lloyd's Rep 271 at 274 per Bingham J; *Motor and General Insurance Co v Pavy* [1994] 1 WLR 462 at 469; and *Total Graphics Ltd v AGF Insurance Co Ltd* [1997] 1 Lloyd's Rep 599.

18

45. Instead, failure to comply with a contractual notice provision will result in forfeiture of coverage, or permit a reinsurer to deny a claim only if the provision of notice was a condition precedent. That is, if a notice requirement is a condition precedent, there is no need to demonstrate any actual loss resulting from late notice; instead, the reinsured has simply failed to comply with a mandatory prerequisite for coverage: see, e.g., *Astor Management AG v Atalya Mining Plc* [2017] 1 Lloyd's Rep 476 *per* Leggatt J at [46] where he held that: '*Where an insurance policy stipulates that complying with a requirement to provide notice of a claim or specified information to insurers is a condition precedent to their liability, there is no principle that the condition is only breached if the insurers have been prejudiced by the failure to comply*'; and see *MacGillivray* at §§30-040 – 30-041.

46. If the notice requirement is not a condition precedent to the reinsurer's indemnification obligation, the only consequence under English law of late notice is to give the reinsurer a potential counterclaim for damages, assuming it can actually prove a pecuniary loss. As stated by Phillips J in *Cox v Bankside* [1995] 2 Lloyd's Rep. 437 at 453, where a term has been breached which is not a condition precedent '*the insurer's only remedy is to claim damages for the extra expense flowing from the insured's failure to give notice within the proper time.*'[23] Thus, as noted by Colman J in *Alfred McAlpine v BAI* [1998] 2 Lloyd's

---

In *Alfred McAlpine Plc v BAI (Run-Off) Ltd* [2000] 1 Lloyd's Rep 437 Waller LJ suggested that a term requiring notice, even if not a condition precedent, could constitute an 'innominate' term, breach of which could go to the heart of the contract, i.e. repudiation (if accepted by the other party). Putting to one aside the conceptual difficulties in respect of a repudiation which went merely to a claim rather than the contract as whole, this notion was rejected by the Court of Appeal in *Friends Provident Life & Pensions Ltd v Sirius International Insurance Corporation* [2006] Lloyd's Rep IR 45.

[23] See also Teare J in *Aspen Insurance UK Ltd v Pectel Ltd* [2008] EWHC 2804 (Comm) at [58]. To similar effect, see *Friends Provident Life & Pensions Ltd v Sirius International Insurance Corp* [2006] Lloyd's Rep IR 45 ('***Friends Provident***') at [31].

19

Rep. 694 at 700, the effect of non-compliance with a notification clause can sometimes have little impact on the insurer / reinsurer.

47.  To similar effect, as the authors of one well-regarded treatise explain, the breach of a notice clause will likely be of no consequence unless it is interpreted by the court as a condition precedent:

> *"If the breach is not so construed, the insurer will be obliged to pay the claim and will only be able to obtain damages from the insured if it can show that it has suffered damage. **The damages are likely to be nominal unless, for example, the insurer can prove that it has been substantially prejudiced and that prejudice can be quantified in monetary compensation.**'* (emphasis supplied)

See Mance, Goldrein and Merkin, *Insurance Disputes* (3rd edn, Informa) at §4.122.

48.  The prospect of recovering damages for breach of a notice provision has been described in the Court of Appeal as *'illusory':* see *Friends Provident* at [39]; and see also *Colinvaux's Law of Insurance* (11th edn, Sweet & Maxwell) at §10-003.

49.  As far as I am aware, there is no reported English judgment of a case in which a reinsurer has sustained a counter-claim for damages arising from late notice. This is not surprising because, in the reinsurance context, one is not concerned with notice to the primary insurer who might be more concerned to investigate a claim and who might lose the opportunity to do so if notice is untimely. This is particularly so where the relevant notice is to be given to facultative reinsurers who have expressly agreed to follow the settlements of the reinsured, thereby joining themselves to the fortunes of reinsured.

50.   As explained by Professor Merkin QC (a leading commentator in the field of insurance law) in *A Guide to Reinsurance Law* (Informa, 2007) at pp.293–294:

> '...it may be difficult for the reinsurers to establish that they have suffered any loss by reason of a breach of condition, particularly if the condition relates to the claims process and the reinsurers would have faced liability in any event. In <u>Friends Provident Life and Pensions Ltd v. Sirius International Insurance Corporation</u> [2006] Lloyd's Rep. IR 45 Waller L.J. described the reinsurers' action for damages as "illusory" and Mance L.J. stated that in many cases damages would at best be "highly speculative".'

51.   The issue, therefore, is whether the notice requirement in the Reinsurance Contracts can be construed as a condition precedent to the reinsurers' liability. The relevant term in both Reinsurance Contracts is the same:

> 'In the event of any occurrence likely to result in a claim under this Policy, immediate notice should be given to:-'

52.   This term is to be construed according to the usual approach of English law to the interpretation of contracts which is well-established by the highest authority.[24] Thus, the Reinsurance Contracts, like all commercial contracts, are construed objectively from the standpoint of a reasonable observer, without reference to pre-contractual negotiations, the subjective intentions or expectations of the parties or post-contract conduct.

53.   Guidance has been given by the courts as to how to approach the construction of terms said to be conditions precedent. In *Bremer Handelsgesellschaft mbH v*

---

[24]     See, e.g., *Investors Compensation Scheme Ltd v. West Bromwich Building Society* [1998] 1 WLR 896, 912. These principles of construction apply equally in the field of insurance: see, e.g., *Bache & Ors v Zurich Insurance Plc* [2014] EWHC 2430 (TCC).

*Vanden Avenne-Izegem PVBA* [1978] 2 Lloyd's Rep 109 at 113, Lord Wilberforce considered the effect of a notice provision providing for cancellation of a sale contract in the event that shipment proved impossible:

> 'Whether this clause is a condition precedent or a contractual term of some other character must depend on (i) the form of the clause itself, (ii) the relation of the clause to the contract as a whole, (iii) general considerations of law.'

54.   It is not essential that the precise phrase 'condition precedent' is expressly used. Other language can also give rise to a condition precedent provided that there is no doubt that the term constitutes a condition precedent : see *George Hunt Cranes Ltd v Scottish Boiler and General Insurance Co Ltd* [2002] Lloyd's Rep 178 at [11] *per* Potter LJ; and *Eagle Star Insurance Co Ltd v Cresswell* [2004] Lloyd's Rep IR 537 at [20] *per* Longmore LJ.

55.   Nevertheless, as a threshold matter, the clause in question must impose an imperative obligation, i.e. that a party *shall* give notice: see, e.g., *Mamidoil-Jetoil Greek Petroleum Co SA v Okta Crude Oil Refinery AD* [2003] 1 Lloyd's Rep 1 *per* Aikens J at [134].

56.   However, as made clear in the leading case of *Friends Provident* at [31] *per* Mance LJ, even if an imperative direction is given (i.e. 'shall'), there must also be a conditional link between the action required and the obligation sought, i.e. that *unless* notice is given then the contractual entitlement in question is not triggered: see, e.g., *SHV Gas Supply & Trading SAS v Naftomar Shipping & Trading Co Ltd Inc (the "Azur Gaz")* [2006] 1 Lloyd's Rep 163 ('***The Azur Gaz***') *per* Christopher Clarke J at [39]; and see *Aspen Insurance UK Ltd v Pectel Ltd* [2009] 1 Lloyd's Rep IR 440 at [62] *per* Teare J. As stated by Beatson LJ in

22

*Heritage Oil And Gas Ltd & Anor v Tullow Uganda Ltd* [2014] EWCA Civ 1048 at [33] – [34]:

> 'The starting-point of my analysis of this issue is the general appreciation by courts for over half a century that, while classifying a term as a condition precedent or as a condition may provide certainty, it can also have the effect of depriving a party to a contract of a right because of a trivial breach which has little or no prejudicial effect on the other and causes that other little or no loss. It was for that reason that, in the context of international sale and carriage contracts, the courts became more reluctant to classify terms as conditions precedent and conditions. This reluctance led to the identification and growth of the category of "intermediate" terms and to require that clear words be used if a term is to be construed as a condition precedent or a condition.
>
> \*       \*       \*
>
> [34] In the context of insurance contracts, this appreciation is reflected by some reluctance to classify notification of loss provisions as conditions precedent: see, for example, Colman J in <u>Alfred McAlpine Plc v BAI (Run Off) Ltd</u> [1998] 2 Lloyd's Rep 694 at 699 – 700. In such contracts it has been stated that what has to be found is a "conditional link" between the assured's obligation to give notice and the underwriters' obligation to pay the claim: see <u>Friends Provident Life and Pensions Ltd v Sirius International Insurance Corp</u> [2005] EWCA Civ 601, reported at [2006] Lloyd's Rep IR 45 at [31] per Mance LJ (as he then was).'

57.   In addition, construed in context, the clause must reflect a clear intent to disentitle the other party of its rights absent satisfaction of the contractual notice requirement: see *The Azur Gaz* at [39] *per* Christopher Clarke J.

58.   In similar vein, English courts have observed that, if a specific sanction (i.e. non-liability) is intended, it is reasonable to expect sophisticated parties to have expressed that intention in clear language: see *Great Elephant Corporation v*

23

*Trafigura Beheer BV* [2012] 2 Lloyd's Rep 503 *per* Teare J at [122]; and see Leggatt J in *Scottish Power UK Plc v BP Exploration Operating Company Ltd & Others* [2015] EWHC 2658 (Comm) ('*Scottish Power v BP*') at [206].

59. Applying those cannons of construction, it is my opinion that the notice provision in the Reinsurance Contracts cannot legitimately be construed as a condition precedent.

   a. The notice provision is not expressed in imperative terms; instead it is expressed in the subjunctive tense. It states that notice 'should' be given, not that it 'shall' be given. Indeed, even if the imperative 'shall' were used, it would not necessarily follow that the requirement was a condition precedent: see Leggatt J in *Scottish Power v BP* at [207].

   b. Most critically, there is no conditionality, i.e. no link between the requirement of notice and the availability of coverage. Those practising in this field are well acquainted with notice provisions which make timely notice a condition precedent and are drafted to ensure that there is no entitlement *unless* notice is provided within a certain time. The Reinsurance Contracts in question lack any such link between the notice which 'should' be given and the reinsurer's liability to provide coverage. The absence of such conditionality, and the failure to use the term 'condition precedent' is strong pointer *against* the clause being a condition precedent where one is concerned, as here, with standard market wordings used by professionals in the market who should be taken to know how to frame what is intended to be a condition precedent: see *Friends Provident* at [28] *per* Mance LJ.

24

c.   Further, As I have already noted above, the provision does not identify to whom notice is to be given, i.e. to which department, address etc. This uncertainty calls into question whether the parties intended to impose any notice obligation at all. Even if they had, the omission of these details would strongly militate against a construction which made coverage conditional upon compliance. The failure of the parties to complete the notice provision in the Reinsurances cannot be remedied by way of contractual interpretation: see *Scottish Widows Fund and Life Assurance Society v BGC International* [2012] EWCA Civ 607 at [21] *per* Arden LJ.

60.   If the notice requirement is not a condition precedent to the liability of Equitas, then Equitas's only remedy is to counterclaim for any loss (if any can be proved) as a result of late notice.

61.   The next issue is whether English law recognises any exception to the general rule that late notice entitles the reinsurer only to counterclaim for damages it can actually prove to have been caused by the late notice, i.e. whether it matters if the breach was negligent, deliberate etc. The short answer is that it does not: see, e.g., *MacGillivray* at §30-041 which, in the context of a failure of a policyholder to give notice, states that: '*There is no rule of construction of law which would provide the insurer with a defence to the claim in the case of a "serious" breach.*' I am not aware of any case in which a negligent and/or deliberate breach of a notice requirement which is not a condition precedent has given rise to a defence other than a counterclaim for damages. The attempt to argue that an insurer would have a defence as a result of a 'serious' breach of the obligation to give notice (which was not otherwise a condition precedent) was expressly rejected in *Ronson International v Patrick* [2006] Lloyd's Rep IR 194. In other words, the 'manner' of the reinsured's failure to provide timely notice, including whether

25

the failure was deliberate or the result of gross negligence, does not alter the analysis above.

62.   In *Friends Provident*, Mance, LJ explained why the cause or manner of the breach is immaterial:

> *'[31] ...Either some conditional link can, as a matter of construction, be found between performance of the two obligations or it cannot. Where such a link cannot be found as a matter of contractual construction, I see no basis for a new doctrine of partial repudiatory breach to, in effect, introduce one.*
>
> *'[32] A claims notification clause like clause 5 is an ancillary provision. Breach of such a provision is capable of sounding in damages. But I am unable as a matter of construction or implication to find in clause 5 any provision that insurers will be free of liability in the event of a serious breach and/or a breach with serious consequences. Even if one assumes that it might or would have been reasonable for the parties to agree such a provision, reasonableness is not the test for implying a term. Nor do I see any basis for creating a new rule of construction or law which would impose such a provision on these parties.'*
> *Friends Provident* at [31-32] *per* Mance LJ.

## CONCLUSION

63.   I confirm that I have complied with my obligations to provide my independent and objective opinions to assist the Court.

Dated: 15 October 2018

26

DAVID W. J. SCOREY

---

## ANNEX I

---

## CURRICULUM VITAE

DAVID SCOREY, Q.C.
Essex Court Chambers,
24, Lincoln's Inn Fields,
London, WC2A 3EG, UK.

## CAREER

Barrister, Essex Court Chambers (1998-present)

## CREDENTIALS

Appointed Queen's Counsel (2015)

Called to the Bar by Lincoln's Inn (1997)

## EDUCATION

Inns of Court School of Law, 1997

Leiden University, The Netherlands, LLM (European Community Law), 1996

St. John's College, Oxford University, BA (Jurisprudence), 1995

## AWARDS

Honourable Society of Lincoln's Inn: Major Award (Hubert Greenland Scholarship); Wolfson Scholarship; Hardwicke Scholarship

Elected member of the American Law Institute (ALI) December 2010

2012 joint winner of the BILA Book Prize for The Bermuda Form: Interpretation and Dispute Resolution of Excess Liability Insurance (Oxford University Press, 2012)

## EXPERIENCE

Mr. Scorey's experience of commercial litigation and arbitrations regularly involves jurisdictional issues and aspects of foreign law. He has acted in a wide variety of commercial cases, with a particular emphasis on commercial disputes, contracts, financial services and fraud, including dishonest assistance and tracing claims

28

against well-known banks currently being litigated in the Financial List of the High Court. Mr. Scorey is particularly familiar with heavy and complex cases, often involving coordination of litigation in various jurisdictions and working with teams of lawyers. In addition to large and complicated financial litigation, Mr. Scorey has extensive expertise in insurance and reinsurance matters, injunctive relief, asset tracing and anti-suit injunctions, banking disputes and regulatory matters.

Mr. Scorey has advised and acted (both alone and as co-counsel) in a wide range of arbitrations before domestic and international tribunals, both under institutional rules, including ICC, LMAA, LCIA, UNCITRAL, AAA and ad hoc arbitrations. He has particular expertise in insurance and reinsurance arbitration, particularly Bermudan and London arbitrations concerning the Bermuda Form.

## **AREAS OF PRACTICE**

- Arbitration & related court applications
- Commercial dispute resolution
- Conflict of laws & private international law
- Insurance & reinsurance
- International trade, transport & commodities
- Public & administrative law

- Banking & financial services
- Commercial fraud / asset recovery
- Energy & natural resources
- International commercial arbitration
- Media, art, entertainment
- Revenue law (including VAT, IPT, duties & excise)

## **INSURANCE AND REINSURANCE EXPERIENCE**

Mr. Scorey has acted and advised in all types of insurance and reinsurance disputes, both in the Commercial Court and in domestic and international arbitration. In particular, he has litigated disputes relating to avoidance for fraud, misrepresentation, non-disclosure, moral hazard and coverage disputes.

He has particular expertise in respect of Bermuda Form excess liability insurance and has appeared in many arbitrations concerning coverage disputes, in addition to advisory work on the Bermuda form. He advised many of the parties in the Buncefield disaster and is currently involved in a number of coverage disputes against insurers arising from the Deepwater Horizon incident in 2010. In addition,

29

Mr. Scorey has previously acted as an 'expert' on the Bermuda Form in respect of foreign proceedings and arbitrations.

Mr. Scorey has extensive expertise in insurance and reinsurance arbitrations. He is a member of the Panel of Arbitrators of ARIAS (UK), a leading insurance and reinsurance arbitration society.  Mr. Scorey is also a member of the London Chamber of Arbitration's panel of arbitrators.

## ANNEX II

In preparing this report I have reviewed and/or relied on the following documents:

1. Complaint in *The Insurance Company of the State of Pennsylvania v. Equitas Insurance Limited,* Case No. 17-CV-6850(LTS)(HBP)

2. Answer in *The Insurance Company of the State of Pennsylvania v. Equitas Insurance Limited,* Case No. 17-CV-6850(LTS)(HBP)

3. Joint Rule 26(f) Report in in *The Insurance Company of the State of Pennsylvania v. Equitas Insurance Limited,* Case No. 17-CV-6850(LTS)(HBP)

4. Lloyd's Reinsurance Policy No. 8063343

5. Lloyd's Reinsurance Policy No. 8063344

6. ICSOP Policy No. 418-4200, effective 1 October 1968 through 1 October 1971

7. Reinsurance Notice of Loss dated 16 April 2015

8. Reinsurance Notice of Loss dated 28 August 2015

9. Reinsurance Notice of Loss dated 2 November 2015

10. Reinsurance Proof of Loss dated 25 October 2016

11. AIG Report to Reinsurers dated 20 October 2016

12. Letter from Sean Keely to Bill Goldsmith dated 27 January 2017

13. Letter from Bill Goldsmith to Sean Keely dated 26 June 2017

14. Letter from Sean Keely to Bill Goldsmith dated 21 July 2017

31